IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 14-cv-00138-RBJ

KIMBERLY S. PLOUGHE,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

    Defendant.

---

# ORDER

---

This matter is before the Court on review of the Commissioner's decision denying plaintiff Kimberly Ploughe's application for disability insurance benefits pursuant to Title II of the Social Security Act. Jurisdiction is proper under 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the district court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010) (citations omitted). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

The Court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Harper v. Colvin*, 528 F. App'x 887, 890 (10th Cir. 2013) (citations omitted). Thus, although some evidence could support contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court might "have made a different choice had the matter been before it de novo." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (citations omitted).

Upon review, the district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 45 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Ms. Ploughe applied for disability insurance benefits on or around March 17, 2011. She claimed inability to work since her alleged onset date of January 10, 2007[1] due to chronic back pain and mental impairments, chronic low back pain requiring narcotic pain medication, anxiety disorder, depression, and memory problems. R. 227. Ms. Ploughe's date last insured (DLI) was December 31, 2009. The Commissioner denied Ms. Ploughe's application on June 2, 2011. Ms. Ploughe then requested a hearing before an administrative law judge (ALJ), and the ALJ conducted a video hearing on August 14, 2012. On August 22, 2012 ALJ Christel Ambuehl issued an opinion denying benefits. The Appeals Council denied Ms. Ploughe's request for review on November 25, 2013. Thereafter, Ms. Ploughe filed a timely appeal with this Court.

---

[1] Ms. Ploughe later amended her alleged onset date to June 10, 2007.

**BACKGROUND**

The relevant time period for purposes of determining whether Ms. Ploughe is entitled to Social Security Disability benefits is from June 10, 2007 through December 31, 2009. However, preceding events and post-dated medical records may prove relevant if they relate to impairments suffered during this time period.

Ms. Ploughe was involved in a motor vehicle accident in the early 1990s and underwent two surgeries, lumbar laminectomies with fusion, to her lower back in or around 1994. *See* R. 333, 413. These surgeries did not alleviate her pain, at least not fully, and an MRI from February 2010 shows that the anterior fusion at L3-4 was not clearly united, with residual irregular material superiorly separating the fusion bone from the L3 vertebral body. R. 775. The MRI also showed small disc bulges with mild dural sac indentation. *Id.*

In 2004 Ms. Ploughe became a patient at the Mapleton Pain Clinic, where she was treated by Philip Cambe, M.D. (a pain management specialist), Bonnie Wilensky, NP (a nurse practitioner in pain management), and Patrick Vann, Ed.D., a psychologist. During the relevant time period, Ms. Ploughe was treated with a number of medications to alleviate her pain and her anxiety. Ms. Ploughe underwent monthly follow-ups concerning her pain, but she only saw Dr. Vann for psychological treatment a handful of times during this time period. However, she saw Dr. Vann frequently both before and after the relevant time period. The gap in treatment is due to Ms. Ploughe's inability to afford care arising from a lack of insurance coverage. *See* R. 88.

In 2008 Ms. Ploughe was referred to a neurologist, Raj Kakkar, MD, by her primary care physician. Dr. Kakkar performed several EEG studies. Two occurred before the DLI, on October 15, 2008 and April 29, 2009. R. 467–70. Three others took place after the DLI passed, on April 29, 2010, April 29, 2011, and August 17, 2011. R. 471–72; 844; 846–47. The three

EEGs post-dating Ms. Ploughe's DLI were identified as abnormal, with the last one markedly abnormal. However, the two predating the DLI were not described as abnormal. The October 15, 2008 EEG left the following impressions: Ms. Ploughe exhibited asymmetrical dysrhythmia, sharp in nature, left frontotemporal region with evidence of sharp waves; the findings are clearly asymmetrical and localized to the left. R. 467-68. And the April 29, 2009 EEG notes: Ms. Ploughe continues to exhibit some sharp contouring of the frontotemporal activity, slightly asymmetrical on the left side, however, except for occasional isolated sharp wave, there is no evidence of any other distinct epileptiform discharges. R. 469-70. For about a year during the relevant time period Ms. Ploughe complained of memory problems, such as forgetfulness. *See* R. 582–83. In response, Dr. Kakkar placed Ms. Ploughe on 200mg of Lamictal (100 mg twice per day) in November 2008, *see* R. 582, which was reported as having had a significant beneficial impact on Ms. Ploughe's functioning by December 2009. *See* R. 577. Ms. Ploughe reports that the Lamictal was then titrated down to 100 mg, at which point the beneficial effects were lost, and raised again to 150 mg.

During this time period Ms. Ploughe began developing problems with balance and vertigo, resulting in the need to use a cane when walking. She was also diagnosed with iron deficient anemia, for which she required nine intravenous iron infusions over a period of seven months beginning on or around October 19, 2009. *See* R. 557–58. Ms. Ploughe's hematologist, David Faragher, MD, opined that Ms. Ploughe would probably need maintenance iron infusions on an intermittent basis going forward. *Id.* However, Ms. Ploughe's hematocrit level has been above 30% since at least October 2009, and has continued to steadily rise through the years. *See* R. 549; *see also* R. 527; 538–39; 542–43; 547–48. In May 2010 her hematocrit level was at 43.4%. R. 496, 536.

In April 2011 Ms. Ploughe filled out a Function Report describing the limitations in her daily activities that she suffers due to her impairments. *See* R. 248–54. In the report Ms. Ploughe describes leading a very limited lifestyle, including an inability to stand long enough to cook; an inability to do house or yard work because of limitations bending, stooping, lifting, or standing long enough; an ability to drive only short distances; short-term memory loss; and an ability to walk for only five minutes at a time. She also indicates that she does not take care of anyone else, such as a spouse, children, grandchildren, or others. However, the severity of these subjective reports is not supported by either Ms. Ploughe's own testimony in the hearing or in the treatment notes, at least not for the relevant time period.

During the hearing – which took place over a year later in August 2012 – Ms. Ploughe states that she had been limited to driving short distances for only the past year, that during the relevant time period she drove herself. R. 56–57. Though Ms. Ploughe reports chronic pain preventing her from lifting, bending, and standing for long periods of time, R. 61, she also describes taking care of her newborn grandchild full-time while her daughter was working, caring for him "like a normal mother," R. 79. Once the baby turned one Ms. Plough began watching him 20 hours a week, as her daughter began working part-time. R. 80. Ms. Ploughe describes her typical day during the relevant time period as "picking up after the kids, baking, cooking something on the top of the stove or putting something in the crockpot." R. 77. She also stated that she folded the laundry, vacuumed about once a week, and used a broom to sweep crumbs from under the table. R. 78.

According to Ms. Ploughe's treatment notes and testimony, she was also engaging in other significant life activities. With respect to travel, Ms. Ploughe reported that she was planning a road trip in October 2007, R. 415; she was planning a trip to California in May 2009,

R. 446; she took a five-week trip to Wisconsin to see family in late 2009, R. 81; 438; and she took a trip to Breckenridge in or around October 2009, R. 440.  While Ms. Ploughe has described pain and discomfort from undertaking such long trips, it is evident that Ms. Ploughe was still able to travel.  In fact, she reported taking an RV trip through the Northeast in 2011.  R. 80. Furthermore, in July 2009 Ms. Ploughe reported engaging in increased activities at home, such as gardening.  R. 444.  In May 2008 Ms. Ploughe reported frequently spending time with all six of her grandchildren, which made her feel overwhelmed, but she remained functional.  R. 464. According to her treatment records, she only started setting limits on how often and how long she could care for her grandchildren in January 2010, after the DLI.  R. 434.

### Denial of the Claim

To qualify for disability insurance benefits, an individual must (a) meet the insured status requirements of the Social Security Act (the "Act"); (b) not have attained retirement age; (c) file an application; and (d) be under a "disability" as defined in the Act.  42 U.S.C § 423(a)(1). Disability is defined as being unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).  The claimant carries the burden of establishing that she was disabled prior to her date last insured (DLI).  *See Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2008).

The Social Security Administration uses a five-part process to determine whether a claimant qualifies for disability insurance benefits.  20 CFR § 404.1520.  At **step one** the ALJ must determine whether the claimant is engaging in substantial gainful activity.  20 CFR §

404.1520(a)(4)(i). The ALJ found that Ms. Ploughe had not engaged in substantial gainful activity since 2004, before her alleged onset date of June 10, 2007. R. 30.

At **step two** the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that are "severe." 20 CFR § 404.1520(a)(4)(ii). The ALJ found that Ms. Ploughe suffered from the following severe impairments: history of left sacroiliac joint fusion, chronic neuropathic pain, mild cognitive impairments, pain disorder, and anxiety. R. 31. The ALJ found that the following impairments were non-severe: opioid abuse and seizure disorder. *Id.*

At **step three** the ALJ must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). 20 CFR § 404.1520(a)(4)(iii). The ALJ determined that none of Ms. Ploughe's impairments—alone or in combination—met or medically equaled one of the listed impairments in the Listings. R. 31.

Before reaching step four, the ALJ is required to determine the claimant's residual functional capacity ("RFC"). *See* R. 16; 20 CFR § 404.1520(a)(4)(iv). An RFC represents "the most [a claimant] can still do despite [her] limitations." 20 CFR § 404.1545(a)(1). The RFC is "the claimant's maximum sustained work capability." *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988). The ALJ found that Ms. Ploughe has an RFC to perform light work as defined in 20 CFR § 404.1567(b) with the following limitations: the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit (with normal breaks) for 6 hours of an 8-hour workday; stand and/or walk (with normal breaks) for 2 hours of an 8-hour workday; need to use a cane for walking distances longer than one block; occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl;

no exposure to unprotected heights or moving mechanical parts; and limited to carrying out simple, routine, and detailed work, but not complex work. R. 35.

At **step four** the ALJ must determine whether the claimant has the residual functional capacity to perform the requirements of her past work. 20 CFR § 404.1520(a)(4)(iv). The ALJ found that Ms. Ploughe could no longer perform her past relevant work. R. 40.

At **step five** the ALJ must determine whether the claimant is able to do any other work that exists in significant numbers in the national economy considering the claimant's RFC, age, education, and work experience. 20 CFR § 404.1520(a)(4)(v). Relying on the testimony of a Vocational Expert ("VE"), the ALJ found that Ms. Ploughe would be able to perform the requirements of representative occupations such as a receptionist, order clerk, and credit card clerk, all of which are sedentary with Specific Vocational Preparation (SVP) codes of 3 or 4 – utilizing Ms. Ploughe's transferrable skills including the ability to use a keyboard, computers, and standard office equipment – which exist in significant numbers in the national economy. R. 41; *see also* R. 90.

## ANALYSIS

Ms. Ploughe contends that she should have been found to have been limited to unskilled work, either sedentary or light duty, which would have resulted in a finding of disability under either Medical Vocational Disability Rule 201.14 or 202.06. Through counsel Ms. Ploughe raises four issues on appeal. She claims that: (1) the ALJ erred in evaluating her RFC by giving little or no weight to the opinions of Ms. Ploughe's treating medical sources; (2) the ALJ failed to obtain medical expert testimony on which to base her Step 3 determinations, and she also failed to accurately analyze the medical evidence in relation to the applicable Listings; (3) the ALJ did not base her credibility findings on substantial evidence; and (4) the ALJ erroneously

found that Ms. Ploughe could use transferrable skills and thereby applied the incorrect rule as a framework under 20 C.F.R. § 404, Subpart P, Appendix 2 (the "Grid Rules") at Step 5.

### A. Treating Source Opinions.

Ms. Ploughe argues that the ALJ failed to base her RFC findings on substantial evidence and erred as a matter of law in her treatment of treating medical source opinions. In particular, Ms. Ploughe contends that the ALJ failed properly to consider the treating source opinions of her treating psychologist, Dr. Vann; her treating neurologist, Dr. Kakkar; and her treating clinical nurse, Ms. Wilensky.

"[I]n evaluating the medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). "The initial determination the ALJ must make with respect to a treating physician's medical opinion is whether it is conclusive, i.e., is to be accorded 'controlling weight,' on the matter to which it relates." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). The opinion must be given controlling weight if "it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins*, 350 F.3d at 1300; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). If the opinion is deficient in either of these respects, it should not receive controlling weight. *Id.*

If a medical opinion by a treating physician is not given controlling weight, it is still entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. *Watkins*, 350 F.3d at 1300 (citing SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)). Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment

> provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1301 (citing *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)).  Although an ALJ should consider all of these factors, it is not necessary that he explicitly discuss every factor. *Oldham*, 509 F.3d at 1258.  Moreover, the ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.  *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004).

Ms. Ploughe contends that the ALJ failed to give proper weight to Medical Source Statements (MSS) filled out by Dr. Kakkar, Dr. Vann, and Ms. Wilensky.  However, the ALJ gave substantiated reasons for giving each of these opinions little (Vann, Wilensky) or no (Kakkar) weight.  First, she explained that both Dr. Kakkar's and Ms. Wilensky's MSS were inconsistent with treatment notes during the relevant timeframe; in fact, Dr. Kakkar's was inconsistent with his own notes.  Furthermore, Ms. Ploughe had admitted to performing activities of daily living that required attention to detail and stress, which likewise contradicted Dr. Kakkar's MSS.  Ms. Ploughe contends that the evidence, particularly her hearing testimony, demonstrates that she did not in fact have these capabilities such that the ALJ failed to base her decision in substantial evidence.  The Court has reviewed the transcript from the hearing and disagrees.

Second, Dr. Vann's MSS was given little weight because it was prepared in June 2006, a year before the alleged onset date.  As such, the ALJ found that it did "not provide significant insight into the claimant's limitations during the relevant time period." R. 40.  Ms. Ploughe argues that it was improper to discount this opinion because there was no evidence that her

condition improved during that time period, and that if anything the evidence showed that she deteriorated cognitively beginning in 2008.  Yet the ALJ thoroughly considered Ms. Ploughe's cognitive limitations by reviewing the treatment records and her hearing testimony.  *See* R. 37.  The ALJ was not bound to give controlling weight to a medical opinion that did not fall within the relevant time period.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance.").  Furthermore, based on its own review of the record the Court has found that Ms. Ploughe's cognitive abilities, such as her memory, have in fact improved since June 2006.

The Court finds that the ALJ properly considered the medical treatment records when determining what weight to give each treatment provider's MSS, and that her thorough consideration of both the records and the MSS opinions strongly suggests that she considered all of the relevant factors when determining how much weight to assign each.

### B. Step 3 Listings Determinations.

Next, Ms. Ploughe argues that the ALJ improperly failed to call for medical expert testimony on the issue of medical equivalence to the Listings at Step 3.  She also contends that the ALJ failed accurately to assess the medical evidence when determining whether Ms. Ploughe's impairments met or medically equaled any of the Listings.

Though the ALJ is responsible for deciding the ultimate legal question of whether a Listing is met or equaled, "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."  Social Security Ruling ("SSR") 96-6P

1996 WL 374180, at *3 (July 2, 1996).[2] "The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Id.* "When an administrative law judge or the Appeals Council finds that an individual s impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant." *Id.* However, an ALJ must obtain an updated medical opinion from a medical expert either (a) when the ALJ believes that the symptoms, signs, and laboratory findings in the record suggest that a judgment of equivalence may be reasonable, or (b) where additional medical evidence is received that in the opinion of the ALJ may change the State agency medical or psychological consultant's finding of no equivalence. *Id.* at *3–4.

In this case, the State agency medical consultant Anthony LoGalbo, MD, found that medical "[e]vidence from [the onset date through the date last insured] does not show the [claimant] meets or equals a [medical] listing . . . ." R. 107. And the State agency psychological consultant found that there was insufficient evidence to establish that Ms. Ploughe met or equaled a psychological Listing. *See* R. 108. The plaintiff contends that the ALJ had found that the State agency medical and psychological opinions were entitled to "little weight" and that, as such, she was required to seek a medical opinion on this issue. This characterization is inaccurate. The ALJ found that the opinions were entitled to little weight only insofar as they

---

[2] Social Security Rulings "are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1). The rulings represent "precedent final opinions and orders and statements of policy and interpretations that [the Commissioner has] adopted." *Id.* They are to be relied upon as precedents in adjudicating cases. *See* Social Security Rulings: Preface, *available at* http://ssa.gov/OP_Home/rulings/rulings-pref.html.

found insufficient evidence to complete an RFC assessment for the relevant time period. R. 39. The ALJ made no such determination with respect to the weight given to these opinions regarding the equivalence to the Listings. The burden is on the plaintiff to demonstrate that her impairment meets or equals a Listing, and ALJ Ambuehl adequately performed her job of developing the record by receiving medical and psychological opinions on the issues. *See Carbajal v. Astrue*, No. 10-CV-02025-PAB, 2011 WL 2600984, at *3 (D. Colo. June 29, 2011).

The Court also disagrees with Ms. Ploughe's position that the ALJ failed accurately to assess the medical evidence when determining whether her impairments met or medically equaled any of the Listings. The ALJ reviewed all of the medical evidence on record and gave a thorough analysis with respect to each Listing. *See* R. 31–34. Finally, the Court has considered the arguments Ms. Ploughe sets forth in her brief in support of her claim that she met or equaled a Listing as well as the arguments against put forward by the Commissioner in her response. Based on a review of the medical evidence on file, the Court finds that there was substantial evidence in the record for the ALJ to have determined that Ms. Ploughe's impairments, individually or in combination, did not meet or equal a Listing.

### C. <u>Credibility</u>.

Ms. Ploughe contends that the ALJ failed to base her credibility findings on substantial evidence. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). However, these determinations "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.*

The ALJ must evaluate the credibility of the claimant's testimony where that testimony could influence the ultimate finding of disability. 20 C.F.R. § 404.1529(a). In this case, the ALJ concluded that Ms. Ploughe's testimony regarding the intensity, persistence, and limiting effects of her impairments was not credible to the extent it conflicted with the RFC Assessment. R. 36. This Court has previously discussed the foregoing boilerplate language and has noted that it can be problematic "'when it appears in the absence of a more thorough analysis.'" *Lloyd v. Colvin*, No. 12-CV-3350-RBJ, 2014 WL 503765, at *9 (D. Colo. Feb. 6, 2014) (quoting *Holbrook v. Colvin*, 521 F. App'x 658, 664 (10th Cir. 2013)). In this case, however, the Court finds that the analysis was thorough, and that the ALJ's conclusions were supported by substantial evidence in the record.

First, Ms. Ploughe argues that the ALJ improperly found her to be less credible on the grounds that her testimony regarding her psychological symptoms was "vague." *See* [ECF No. 13 at 25]. This mischaracterizes the ALJ's opinion. The ALJ wrote that "[w]hile the claimant's testimony regarding her alleged psychologically based symptoms was somewhat vague, she generally complained of increased feelings of anxiety and memory loss during the relevant time period." R. 35. There is no suggestion or other indication that the ALJ found Ms. Ploughe less credible based on this characterization of her testimony.

Next, Ms. Ploughe contends that it was inaccurate for the ALJ to have found that she could usually walk without difficulty, that she exhibited normal gait, and that her problems with walking were only sporadic. First, the opinions that Ms. Ploughe could typically walk without difficulty and that she exhibited normal gait were conclusions based on the medical treatment records. Second, the ALJ only stated that Ms. Ploughe's *complaints* of reduced walking tolerance and problems with leg weakness were sporadic, not the problems themselves. Yet

more importantly, Ms. Ploughe fails to establish how these findings have prejudiced her.  The ALJ stated that she accepted the claimant's testimony that she could only walk one block without a cane, which was incorporated into the RFC.  R. 37.  She also accepted some of Ms. Ploughe's allegations regarding limited mobility and, as such, had limited her to standing and/or walking for two hours in an 8-hour workday.  *Id.*  The ALJ, however, concluded that the medical evidence in the record did not support additional limitations.  Ms. Ploughe has not argued that she requires further limitations, just that the "credibility" analysis was inaccurate.

Next, Ms. Ploughe contends that it was improper for the ALJ to conclude that her pain was well-controlled with medications.  (Again, this argument seems to be a challenge to the ALJ's review of the medical records, not a credibility determination.)  According to the plaintiff, she required large doses of three different pain medications and yet still had significant pain. She cites to *Saleem v. Chater*, 86 F.3d 176 (10th Cir. 1996), in support of her contention that required chronic use of narcotic pain medication is not effective control of pain.  However, that case concerned a claimant who was addicted to her pain medications.  While Ms. Ploughe has suffered from opioid addiction in the past, *see* R. 339; 363, no claim has been made that Ms. Ploughe was relying on the use of medicines to which she was addicted in order to relieve her pain during the relevant time period.  *See Saleem*, 86 F.3d at 179–80.  With respect to the finding itself, the ALJ based her opinion on a thorough analysis of the medical treatment records.  Upon review of those records, the Court finds that the opinion is supported by substantial evidence.

Next, the plaintiff argues that the ALJ inaccurately found that her pain treatment was conservative and did not include surgery or invasive measures and also that her cognitive impairments were only mild.  These are once again not issues of credibility.  However, upon a review of the record the Court finds that the ALJ's findings are supported by substantial

evidence. Furthermore, the ALJ expressly incorporated some mental limitations into the RFC assessment in response to Ms. Ploughe's allegations of cognitive impairments. *See* R. 37.

Ms. Ploughe contends that the ALJ improperly found that she had limited motivation to work without asking her about her work history during the hearing. According to Ms. Ploughe, the ALJ inappropriately surmised that her periods of unemployment were "apparently by choice." [ECF No. 13 at 27]. During the hearing, Ms. Ploughe testified that in 2004 (she mistakenly says 2007) she voluntarily left her job because she began having anxiety around people, she felt forgetful, and she had problems bending, lifting, and staying on her feet. R. 60. Though Ms. Ploughe contends that she has not worked since 2004 because of her impairments, her previous application for disability benefits was denied, a decision which was affirmed on appeal to this Court. In effect, she has been found to have been not disabled during that time period. While there is no res judicata effect of that decision on this application, the Court will also not entertain an argument that has been foreclosed by previous adjudications. That said, the Court agrees that it is not necessarily clear from the records that Ms. Ploughe has limited work motivation, and an inquiry on the record during the hearing would have proven useful. The Court also would have given more credence to Ms. Ploughe's work history based on her military service. Still, the Court sees no reversible harm here. Based on a review of the work history records, the Court finds that the ALJ's opinion was based on substantial evidence.

Lastly, Ms. Ploughe argues that the ALJ made inaccurate credibility findings based on her report of daily activities. First, Ms. Ploughe contends that her testimony concerning care for her grandchild demonstrated confusion, reflecting cognitive impairment not lack of credibility. The ALJ, however, found otherwise. In particular, Ms. Ploughe reported that a 6-month old baby could crawl up onto the bed so that she could change its diaper, and that a 1-2 year old

child was independent enough to take food items out of the refrigerator and bring them to Ms. Ploughe to open. *See* R. 79–80; 86. As an advocate, counsel for Ms. Ploughe may argue that these explanations serve to show that Ms. Ploughe was cognitively impaired during the hearing. However, the ALJ has a right to make her own credibility determinations surrounding this testimony. In reading the transcript I too found that the testimony was not credible. However, I did not hear how Ms. Ploughe answered the questions, only the ALJ did, and I must trust her determination of whether the testimony appeared to demonstrate confusion or evasiveness. The Court will not upset this finding.

Ms. Ploughe also contends that her reports of daily living do not support that she was able to perform substantial gainful activity on a regular and continuing basis. This argument does not go to credibility but to the RFC assessment. And Ms. Ploughe has not explained in what way these daily activity reports conflict with the RFC. Furthermore, Ms. Ploughe mischaracterizes her reports of daily activities. In particular, she did not simply "pick up after her [grand]kids" who visited once per week. *See* [ECF No. 13 at 28]. Instead, she began taking care of one of her grandchildren full-time when he was just four months old, and then continued to care for him for 20-hours a week after the age of one. *See* R. 79; 419. Notably, the baby was due in or around April 2007, *see* R. 301; 333, meaning that Ms. Ploughe was caring for him "like a normal mother" during the relevant time period of alleged disability, *see* R. 79. This type of caregiving relationship hardly constitutes the minimal or sporadic activity Ms. Ploughe paints in her brief.

### D. Step 5 Grid Rules.

Finally, Ms. Ploughe argues that the ALJ failed to base her findings on substantial evidence when she concluded that Ms. Ploughe had the ability to use transferrable skills, and she

thereby erred as a matter of law in finding Ms. Ploughe not disabled under the Grid Rules. Ms. Ploughe's argument effectively comes down to whether her mental RFC was based on substantial evidence. If she was unable to perform detailed work then she could not perform any of the semi-skilled jobs that the Vocational Expert established as available under the RFC. According to Ms. Ploughe, the treating source opinions on record support a finding that she is capable of, at most, simple and repetitive but not detailed work. This determination would limit her to unskilled work, which would allegedly entitle her to a finding of disability.

This argument is simply a rehashing of the argument made above, concerning the treating source opinions of Drs. Kakkar and Vann and Ms. Wilensky. The Court has already found that the ALJ was entitled to give those opinions little or no weight based on the treatment records and other evidence in the record. The Court likewise finds that the ALJ's determination that Ms. Ploughe is capable of performing detailed work is supported by substantial evidence in the record. As such, the RFC is affirmed.

## CONCLUSION

ALJ Ambuehl clearly put substantial effort into her review of the record and into the drafting of a thorough and detailed opinion. The Court has likewise reviewed the record and finds that ALJ Ambuehl's individual opinions and her determination as a whole are based on substantial evidence on the record. While the Court sympathizes with Ms. Ploughe, the medical evidence on record does not support a finding of disability as of December 31, 2009.

## ORDER

The decision of the Commissioner is AFFIRMED.

DATED this 29th day of December, 2014.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge